EXHIBIT D

## CONTRACT OF SALE

THIS CONTRACT OF SALE (this "Agreement") is made and entered into as of the [____] day of [_____], 2009, by and between **LOCUST STREET DEVELOPERS LLC**, a New York limited liability company having an address at 75 Alexander Avenue, Bronx, New York 10454 ("Seller") and [_____], a [_____] having an address at [_____] ("Purchaser").

## W I T N E S S E T H:

A.  On March 9, 2009, Seller filed a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Case No. 09-11094 (RG) (the "Bankruptcy Case").

B.  In connection with the Bankruptcy Case, Seller has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Seller, at the price and upon the terms and conditions set forth in this Agreement, (a) that certain parcel of land commonly known as 550 Locust Street, Mount Vernon, New York, and more particularly described on Exhibit A attached hereto and made a part hereof (collectively, the "Land"), (b) the buildings, improvements, and structures located upon the Land (collectively, the "Improvements"), (c) all other easements and rights appurtenant to the Land, if any (collectively, the "Appurtenant Rights"), and (d) all right, title and interest of Seller, if any, in and to the fixtures owned by Seller and attached or appurtenant to the Property (collectively, the "Personal Property"; the Land, the Appurtenant Rights, the Improvements, and the Personal Property, collectively, the "Property").

C.  As a result of the Bankruptcy Case, the Bankruptcy Court approval of this Agreement is required, subject to the bankruptcy-related terms and conditions set forth herein. In the event that the Bankruptcy Court shall not approve this Agreement, this Agreement shall terminate, and no party hereto shall have any further obligations hereunder except that the Deposit shall be returned to Purchaser in accordance with the terms of this Agreement.

NOW, THEREFORE, for $10.00 in hand paid and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.  Purchase and Sale.  Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Property.

2.  Purchase Price.  The purchase price (the "Purchase Price") for the Property shall be the sum of [_____] AND 00/100 DOLLARS ($[_____]).

3.  Payment of Purchase Price.  The Purchase Price shall be paid to Seller by Purchaser as follows:

3.1  Deposit.  Concurrently herewith, Purchaser shall deposit with Morrison & Foerster LLP ("Escrowee") by a bank wire transfer of immediately available federal funds to an account designated by Escrowee the sum of [_____] AND 00/100 DOLLARS

($[         ]<sup>1</sup>) (the "Deposit"), which Deposit shall be held by Escrowee in accordance with the terms and conditions of Section 10 hereof.

3.2     Closing Payment.  The Purchase Price, as adjusted by the application of the Deposit, shall be paid by Purchaser on the Closing Date (as defined in Section 5) as set forth in Section 5.2(a) herein, by wire transfer of immediately available federal funds to an account or accounts designated in writing by Seller.

4.     Title Matters; Conditions Precedent.

4.1     Title Matters.

4.1.1     Title to the Property.

(a)     As a condition to the Closing, [                    ] or any other title company licensed to do business in the State of New York (the "Title Company") shall have committed to insure Purchaser as the fee owner of the Property in the amount of the Purchase Price by issuance of an ALTA owner's title insurance policy (the "Owner's Policy") and in the standard form issued by the Title Company in the State of New York, subject only to the Permitted Exceptions (as hereinafter defined).

(b)     Purchaser shall order, at its sole cost and expense, within five (5) Business Days (as defined in Section 12.4) following the date hereof, a commitment for an owner's fee title insurance policy with respect to the Property (the "Title Commitment") from the Title Company, and Purchaser shall cause the Title Company to deliver a copy of the Title Commitment, together with true, legible and complete copies of all instruments giving rise to any defects or exceptions to title to the Property, to Seller's attorneys concurrently with delivery of the Title Commitment to Purchaser or Purchaser's attorneys. If any exception(s) to title to the Property should appear in the Title Commitment other than the Permitted Exceptions (such exception(s) being herein called, collectively, the "Unpermitted Exceptions"), subject to which Purchaser is unwilling to accept title, Purchaser shall provide Seller with written notice (the "Title Objection Notice") thereof within ten (10) days after receipt of the Title Commitment and exception documents by Purchaser's attorneys. Seller, in its sole and absolute discretion, may undertake to eliminate the same subject to the terms and conditions of this Section 4.1. Purchaser hereby waives any right Purchaser may have to advance, as objections to title or as grounds for Purchaser's refusal to close this transaction, any Unpermitted Exception of which Purchaser does not notify Seller within such ten (10) day period pursuant to the Title Objection Notice unless such Unpermitted Exception was first raised by the Title Company subsequent to the date of the Title Commitment, in which case, Purchaser shall notify Seller of the same within five (5) days after the Title Company shall notify Purchaser of such Unpermitted Exception (failure to so notify Seller shall be deemed to be a waiver by Purchaser of its right to raise such Unpermitted Exception as an objection to title or as a ground for Purchaser's refusal to close the transaction contemplated by this Agreement). Notwithstanding anything to the contrary contained in this Agreement, Seller, in its sole discretion, shall have the right to adjourn the Closing for a period not to exceed forty-five (45) days (such period of time being herein called the "Extension

_____
<sup>1</sup> 10% of Purchase Price

Period") in order to endeavor to eliminate such Unpermitted Exceptions, provided that Seller shall notify Purchaser, in writing, within ten (10) days after receipt by Seller of the Title Objection Notice, whether or not it will adjourn the Closing for such purpose and the failure to so notify Purchaser shall be deemed to be an election by Seller not to endeavor to eliminate such Unpermitted Exceptions. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, Seller shall not under any circumstance be required or obligated to cause the cure or removal of any Unpermitted Exception including, without limitation, by bringing any action or proceeding, making any payments or otherwise incurring any expense in order to eliminate any Unpermitted Exception or arranging for title insurance insuring against enforcement of such Unpermitted Exception against, or collection of the same out of, the Property, notwithstanding that Seller may have attempted to do so, or may have obtained an adjournment of the Scheduled Closing Date (as defined herein) for such purpose.

(c)     In the event that Seller is unable, or elects (or is deemed to have elected) not, to eliminate all Unpermitted Exceptions in accordance with the provisions of this Section 4.1.1, or to arrange for title insurance, without special premium to Purchaser, insuring against enforcement of such Unpermitted Exceptions against, or collection of the same out of, the Property, and to convey title to the Property in accordance with the terms of this Agreement on or before the Closing Date (whether or not the Closing is adjourned as provided in Section 4.1.1(b)), Purchaser shall have the right, as its sole remedy for such election of Seller, by delivery of written notice to Seller within three (3) Business Days following receipt of notice from Seller of its election not to remove such Unpermitted Exceptions (or the day on which Seller is deemed not to have elected to remove such Unpermitted Exceptions), to either (i) terminate this Agreement by written notice delivered to Seller (in which event the Deposit shall be returned to Purchaser and no party hereto shall have any further obligations in connection herewith except under those provisions that expressly survive the Closing or a termination of this Agreement), or (ii) accept title to the Property subject to such Unpermitted Exception(s) without an abatement in or credit against the Purchase Price. The failure of Purchaser to deliver timely any written notice of election under this Section 4.1.1(c) shall be conclusively deemed to be an election under clause (ii) above.

(d)     If, on the Closing Date, there are any liens or encumbrances that Seller is obligated to discharge under this Agreement, Seller shall have the right (but not the obligation) to either (i) arrange, at Seller's cost and expense, for affirmative title insurance or special endorsements insuring against enforcement of such liens or encumbrances against, or collection of the same out of, the Property, or (ii) subject to the approval of The Bank of New York Mellon ("The Bank of New York"), use any portion of the Purchase Price to pay and discharge the same, in a manner reasonably satisfactory to the Title Company, and the same shall not be deemed to be Unpermitted Exceptions.

4.1.2    Permitted Exceptions to Title.    The Property shall be sold and conveyed subject to the following exceptions to title (the "Permitted Exceptions"):

(a)     any state of facts that the Survey (as defined in Section 4.1.3 below) shows; provided that the Survey does not disclose a state of facts that would render title unmarketable;

(b)     those matters specifically set forth on Exhibit B attached hereto and made a part hereof;[2]

(c)     all laws, ordinances, rules and regulations of the United States, the State of New York, or any agency, department, commission, bureau or instrumentality of any of the foregoing having jurisdiction over the Property (each, a "Governmental Authority"), as the same may now exist or may be hereafter modified, supplemented or promulgated;

(d)     all presently existing and future liens of real estate taxes or assessments and water rates, water meter charges, water frontage charges and sewer taxes, rents and charges;

(e)     any other matter or thing affecting title to the Property that Purchaser shall have agreed or be deemed to have agreed to waive as an Unpermitted Exception;

(f)     all violations of laws, ordinances, orders, requirements or regulations of Governmental Authority applicable to the Property ("Legal Violations") and existing on the Closing Date, whether or not noted in the records of or issued by any Governmental Authority;

(g)     all utility easements of record which do not interfere with the present use of the Property;

(h)     right, lack of right or restricted right of any owner of the Property to construct and/or maintain (and the right of any Governmental Authority to require the removal of) any vault or vaulted area, in or under the streets, sidewalks or other areas abutting the Property, and any applicable licensing statute, ordinance and regulation, the terms of any license pertaining thereto and the lien of street, sidewalk or other area vault taxes, provided any such vault taxes or charges which are then due and payable are paid by Seller at Closing; and

(i)     minor variations between the tax lot lines and the description of the Property set forth on Exhibit A attached hereto and made a part hereof.

4.1.3   Survey. Purchaser shall order, at its sole cost and expense, within five (5) days following the date hereof, a survey of the Property prepared by a surveyor registered in the State of New York, certified by said surveyor to Purchaser and Seller as having been prepared in accordance with the minimum detail requirements of the ALTA land survey requirements, and cause a copy of the survey to be delivered to Seller and Seller's attorneys simultaneously with the delivery of same to Purchaser.

4.2     Inspection of the Property. Seller shall provide Purchaser, or Purchaser's representatives, with reasonable access to the Property upon reasonable advance notice, under Seller's supervision or under the supervision of Seller's representative for the purpose of inspecting the Property. Any entry upon the Property and all inspections shall be made or performed during normal business hours and at the sole risk and expense of Purchaser, and shall not interfere with the activities on or about the Property of Seller, its tenants and their employees and invitees. Purchaser shall:

---

[2] Exhibit B to include all past-due real estate taxes owed by Seller.

(a)     promptly repair any damage to the Property resulting from any such inspections so that the Property shall be in the same condition that it existed in prior to such inspections;

(b)     fully comply with all laws applicable to the inspections and all other activities undertaken in connection therewith;

(c)     take all actions and implement all protections necessary to ensure that the inspections and the equipment, materials, and substances generated, used or brought onto the Property in connection with the inspections, pose no threat to the safety or health of persons or the environment, and cause no damage to the Property or other property of Seller or other persons;

(d)     furnish to Seller and The Bank of New York, at no cost or expense to Seller, copies of all surveys, test results, engineering, and other studies and reports relating to the inspections which Purchaser shall obtain with respect to the Property promptly after Purchaser's receipt of same;

(e)     maintain or cause to be maintained, at Purchaser's expense, a policy of commercial general liability insurance, with a broad form contractual liability endorsement and with a combined single limit of not less than $1,000,000 per occurrence for bodily injury and property damage, automobile liability coverage including owned and hired vehicles with a combined single limit of $1,000,000 per occurrence for bodily injury and property damage, and an excess umbrella liability policy for bodily injury and property damage in the amount of $5,000,000, insuring Purchaser and Seller as additional insureds, against any injuries or damages to persons or property that may result from or are related to (i) Purchaser's and/or Purchaser's Representatives' (as hereinafter defined) entry upon the Property, (ii) any inspections or other activities conducted thereon, and/or (iii) any and all other activities undertaken by Purchaser and/or Purchaser's Representatives, all of which insurance shall be on an "occurrence form" and otherwise in such forms acceptable to Seller and with an insurance company acceptable to Seller, and deliver a copy of such insurance policy to Seller prior to the first entry on the Property;

(f)     not permit the inspections or any other activities undertaken by Purchaser or Purchaser's Representatives to result in any liens, judgments or other encumbrances being filed or recorded against the Property, and Purchaser shall, at its sole cost and expense, immediately discharge of record any such liens or encumbrances that are so filed or recorded (including, without limitation, liens for services, labor or materials furnished); and

(g)     indemnify Seller, The Bank of New York and any agent, advisor, representative, affiliate, employee, director, partner, member, beneficiary, investor, servant, shareholder, trustee or other person or entity acting on Seller's or The Bank of New York's behalf or otherwise related to or affiliated with Seller or The Bank of New York (collectively, "Indemnified Parties") and hold harmless the Indemnified Parties from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements), suffered or incurred by the Indemnified Parties and arising out of or in connection with (i) Purchaser's and/or Purchaser's Representatives' entry upon the Property, (ii) any inspections or other activities conducted

thereon by Purchaser or Purchaser's Representatives, (iii) any liens or encumbrances filed or recorded against the Property as a consequence of the inspections and/or (iv) any and all other activities undertaken by Purchaser or Purchaser's Representatives with respect to the Property.

Without limiting the foregoing, in no event shall Purchaser or Purchaser's Representatives, without the prior written consent of Seller make any intrusive physical testing (environmental, structural or otherwise) at the Property (such as soil borings, water samplings or the like).

**PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, PURCHASER SHALL NOT BE ENTITLED TO TERMINATE THIS AGREEMENT ON ACCOUNT OF THE RESULTS OR FINDINGS OF ITS INVESTIGATIONS OR INSPECTIONS.**

The foregoing obligations shall survive the Closing or a termination of this Agreement.

4.3     Property Information and Confidentiality. All Information (as hereinafter defined) provided to Purchaser shall be subject to the following terms and conditions:

(a)     Neither Seller nor any Indemnified Party makes any representation or warranty as to the truth, accuracy or completeness of the Information, or any other studies, documents, reports or other information provided to Purchaser hereunder and expressly disclaims any implied representations as to any matter disclosed or omitted.

(b)     Purchaser agrees that neither Purchaser nor Purchaser's Representatives shall, at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any person, entity or association the Information, or any other knowledge or information acquired by Purchaser or Purchaser's Representatives from any Indemnified Party or by Purchaser's own inspections and investigations, other than matters that were in the public domain at the time of receipt by Purchaser or Purchaser's Representatives. Without Seller's prior written consent, Purchaser shall not disclose and Purchaser shall direct Purchaser's Representatives not to disclose to any person, entity or association or any of the terms, conditions or other facts with respect to this Agreement, including, without limitation, the status hereof, and shall not market or offer the Property for sale. Notwithstanding the foregoing, Purchaser may disclose such of the Information and its other reports, studies, documents and other matters generated by it and the terms of this Agreement (i) as required by law or court order (provided prior written notice of such disclosure shall be provided to Seller) and (ii) as Purchaser deems necessary or desirable to Purchaser's Representatives in connection with Purchaser's inspections and the transaction contemplated hereby, provided that those to whom such Information is disclosed are informed of the confidential nature thereof and agree(s) to keep the same confidential in accordance with the terms and conditions hereof.

(c)     Purchaser shall indemnify and hold harmless the Indemnified Parties from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred

by any Indemnified Party and arising out of or in connection with a breach by Purchaser or Purchaser's Representatives of the provisions of this Section 4.3.

(d)     Purchaser and Purchaser's Representatives shall use reasonable care to maintain in good condition all of the Information furnished or made available to Purchaser and/or Purchaser's Representatives in accordance with this Section 4.3. In the event this Agreement is terminated prior to Closing, Purchaser and Purchaser's Representatives shall promptly deliver to Seller or destroy all originals and copies of the Information in the possession of Purchaser and Purchaser's Representatives.

(e)     As used in this Agreement, the term "Information" shall mean any of the following: (i) all information and documents in any way relating to the Property, the construction of the Improvements, the operation thereof or the sale thereof, including, without limitation, all leases and contracts furnished to, or otherwise made available for review by, Purchaser or its directors, officers, employees, affiliates, partners, members, brokers, agents or other representatives, including, without limitation, attorneys, accountants, contractors, consultants, engineers, financial advisors, lenders, investors, investment bankers, prospective lenders and prospective investors (collectively, "Purchaser's Representatives"), by any Indemnified Party or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, and (ii) all analyses, compilations, data, studies, reports or other information or documents prepared or obtained by Purchaser or Purchaser's Representatives containing or based on, in whole or in part, the information or documents described in the preceding clause (i), the inspections, or otherwise reflecting their review or investigation of the Property.

(f)     In addition to any other remedies available to Seller, Seller shall have the right to seek equitable relief, including, without limitation, injunctive relief or specific performance, against Purchaser or Purchaser's Representatives in order to enforce the provisions of this Section 4.3.

(g)     Notwithstanding any terms or conditions in this Agreement to the contrary, no conditions of confidentiality within the meaning of IRC §6111(d) or the Treasury Regulations promulgated under IRC Sec. 6011 are intended, and the parties hereto are expressly authorized to disclose every U.S. federal income tax aspect of any transaction covered by this Agreement with any and all persons, without limitation of any kind.

The provisions of this Section 4.3 shall survive the termination of this Agreement in the event this Agreement is terminated prior to Closing.

4.4     Conditions Precedent to Obligations of Purchaser.     The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the performance and observance by Seller of all material covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date, (ii) the Bankruptcy Court shall have entered an order approving this Agreement and the sale of the Property to Purchaser pursuant to Sections 105 and 363 of the Bankruptcy Code (the "Sale Order"), and (iii) the fulfillment on or before the Closing Date of all

other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any or all of which may be waived by Purchaser in its sole discretion.

Purchaser acknowledges that Seller does not guarantee the satisfaction of the conditions precedent listed in this Section 4.4 and that Seller's failure to satisfy such conditions shall not be deemed to be a default hereunder but rather, same shall merely be a failure of a condition to Closing, in which event Purchaser's sole remedy shall be to (i) waive such condition(s), or (ii) terminate this Agreement and receive a refund of the Deposit; provided, however, Seller shall be permitted to adjourn the Closing Date for a period of up thirty (30) days in order to satisfy any condition precedent that has not been satisfied.

4.5     Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the following conditions: (i) the Bankruptcy Court shall have entered the Sale Order, (ii) the performance and observance by Purchaser of all material covenants and agreements of this Agreement to be performed or observed by Purchaser prior to or on the Closing Date, and (iii) the fulfillment on or before the Closing Date of all other conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in its sole discretion.

4.6     Bankruptcy Conditions. By no later than [____] days after the date hereof, the Bankruptcy Court shall have entered the Sale Order in form reasonably acceptable to the Purchaser, Seller and The Bank of New York that, without limitation, shall (i) include a finding that the Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, and (ii) provide that the Purchaser is obtaining the Property free and clear of any lien, claim or interest, except as otherwise provided for in the Agreement.

5.     Closing. Subject to the satisfaction or waiver of all conditions precedent with respect to each party's obligation, the closing (the "Closing") of the sale and purchase contemplated herein shall occur at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 at 10:00 a.m. on or before the day which is not more than ten (10) Business Days after the Bankruptcy Court enters the Sale Order, or if such date is not a Business Day, then the next Business Day following such date (the "Scheduled Closing Date"), and **TIME SHALL BE OF THE ESSENCE** with respect to each party's obligation to close on any such date, (the date on which the Closing shall occur being herein referred to as the "Closing Date"). Notwithstanding the foregoing, Seller shall have the right to adjourn the Closing in accordance with Section 4.1.1(b). The Closing shall constitute approval by each party of all matters to which such party has a right of approval and a waiver of all conditions precedent.

5.1     Seller Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by Seller, as appropriate:

(a)     a bargain and sale deed without covenant (the "Deed") in the form attached hereto and made a part hereof as Exhibit C;

(b)     a certification of non-foreign status in the form attached hereto and made a part hereof as Exhibit D;

(c) all existing surveys, blueprints, drawings, operating manuals, plans and specifications for or with respect to the Property or any part thereof, to the extent the same are in Seller's possession;

(d) all keys to the Improvements, to the extent the same are in Seller's possession;

(e) such further instruments as may be necessary to record the Deed;

(f) evidence reasonably satisfactory to the Title Company respecting the due organization of Seller and the due authorization and execution by Seller of this Agreement and the documents required to be delivered hereunder;

(g) a bill of sale as to any personal property included in the sale (for which no separate consideration shall be given), in the form attached hereto and made a part hereof as Exhibit E hereto;

(h) a copy of the Sale Order;

(i) possession of the Property free of all leases, tenancies, occupancies, service contracts, other executory contracts (other than Permitted Exceptions);

(j) an owner's affidavit substantially in the form attached hereto and made a part hereof as Exhibit F (with customary modifications as may be reasonably requested by the Title Company); and

(k) such further instruments as may be necessary to consummate the transaction.

5.2     Purchaser Deliveries.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following items executed and acknowledged by Purchaser, as appropriate:

(a) payment of the Purchase Price to be made in accordance with Section 3 above;

(b) evidence reasonably satisfactory to Seller and the Title Company respecting the due organization of Purchaser and the due authorization and execution by Purchaser of this Agreement and the documents required to be delivered hereunder; and

(c) such further instruments as may be necessary to consummate the transaction.

5.3     Closing Costs.  Purchaser shall pay (a) the costs of the title insurance premiums for the Owner's Policy, (b) the cost of any title endorsements and affirmative insurance required by Purchaser, (c) the costs of the Survey and (d) any recording charges and transfer taxes payable in connection with the recording of the Deed. Except as expressly provided in the indemnities set forth in this Agreement, Seller and Purchaser shall pay their

respective legal, consulting and other professional fees and expenses incurred in connection with this Agreement and the transaction contemplated hereby. The provisions of this Section 5.3 shall survive the Closing or a termination of this Agreement.

5.4     Other Purchaser Costs.   Purchaser shall be solely responsible for the payment of the following, whether incurred prior to or after the date hereof:

(a)     All real estate taxes, water charges, sewer rents, vault charges and other assessments due with respect to the Property.

(b)     All utilities, including, without limitation, telephone, steam, electricity and gas.

6.     Condemnation or Destruction of Property/Maintenance.

6.1     In the event that any portion of the Property is taken pursuant to eminent domain proceedings or condemnation or any of the improvements on the Property are damaged or destroyed by fire or other casualty, Seller shall have no obligation to restore, repair or replace any portion of the Property or any such damage or destruction and no adjustment shall be made to the Purchase Price as a result thereof. Seller shall, at the Closing, assign to Purchaser all of Seller's interest in all awards or other proceeds for such taking by eminent domain or condemnation or the proceeds of any insurance collected by Seller for such damage or destruction or the right to receive such proceeds (unless Seller shall have repaired such damage or destruction prior to the Closing and except to the extent any such awards, proceeds or insurance are attributable to lost rents or items applicable to any period prior to the Closing), less the amount of all reasonable, third-party costs incurred by Seller in connection with the repair of such damage or destruction or collection costs of Seller respecting any awards or other proceeds for such taking by eminent domain or condemnation or any uncollected insurance proceeds which Seller may be entitled to receive from such damage or destruction, as applicable. The parties hereby waive the provisions of any statute which provides for a different outcome or treatment in the event of a casualty or a condemnation or eminent domain proceeding, including, without limitation, Section 5-1311 of the General Obligations Law of the State of New York. The provisions of this Section 6.1 shall survive the Closing.

7.     Representations, Warranties and Covenants; "As Is" Sale.

7.1     Representations and Warranties of Seller.   Seller represents and warrants to Purchaser that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

(i)     This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the Sale Order. Seller has taken all necessary action to authorize and approve the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, subject to the Sale Order.

(ii)     Subject to the entry of the Sale Order, the execution and delivery of this Agreement and the performance by Seller of its obligations hereunder do not and

will not (a) conflict with or violate any law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity with jurisdiction over Seller or the Property, including, without limitation, the United States of America, the State of New York or any political subdivision of any of the foregoing, or any decision or ruling of any arbitrator to which Seller is a party or by which Seller or the Property is bound or affected, or (b) violate or constitute a default under any material document or instrument to which Seller is a party or is bound or any of Seller's formation or governing documents.

(iii)    Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code, as amended (the "Code").

(iv)    The foregoing representations and warranties shall not survive the Closing.

Purchaser acknowledges and agrees that the architect, Peter F. Gaito & Associates (the "Architect"), claims to be owed certain amounts pursuant to the Architect's Agreement and that Seller shall have no obligation to pay any such amounts. Seller agrees to cooperate with Purchaser in order to cause the Bankruptcy Court to make a determination of any amounts owed to the Architect pursuant to the Architect's Agreement and Purchaser shall be solely responsible for any such amount to the extent it desires to use the architectural plans of the Architect in accordance with the terms of the Architect's Agreement and/or that certain letter agreement, dated June 8, 2009, between Architect and the Bank of New York (the "Will Serve Letter"), as applicable.

7.2    [Reserved].

7.3    GENERAL DISCLAIMER. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE SALE OF THE PROPERTY HEREUNDER IS AND WILL BE MADE ON AN "AS IS," "WHERE IS," AND "WITH ALL FAULTS" BASIS, WITHOUT ANY REPRESENTATION AND WARRANTY OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR OTHERWISE, INCLUDING ANY REPRESENTATION OR WARRANTY CONCERNING TITLE TO THE PROPERTY, THE CONSTRUCTION OF THE IMPROVEMENTS, THE PHYSICAL CONDITION OF THE PROPERTY (INCLUDING THE CONDITION OF THE SOIL OR THE IMPROVEMENTS), THE ENVIRONMENTAL CONDITION OF THE PROPERTY (INCLUDING THE PRESENCE OR ABSENCE OF HAZARDOUS SUBSTANCES ON OR AFFECTING THE PROPERTY), THE COMPLIANCE OF THE PROPERTY WITH APPLICABLE LAWS AND REGULATIONS (INCLUDING ZONING AND BUILDING CODES OR THE STATUS OF DEVELOPMENT OR USE RIGHTS RESPECTING THE PROPERTY), THE PRESENT AND FUTURE ZONING APPLICABLE TO THE PROPERTY, THE FINANCIAL CONDITION OF THE PROPERTY OR ANY OTHER REPRESENTATION OR WARRANTY RESPECTING ANY INCOME, EXPENSES, CHARGES, LIENS OR ENCUMBRANCES, RIGHTS OR CLAIMS ON, AFFECTING OR PERTAINING TO THE PROPERTY OR ANY PART THEREOF. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS EXAMINED, REVIEWED AND INSPECTED ALL MATTERS WHICH IN PURCHASER'S JUDGMENT BEAR UPON THE PROPERTY AND ITS VALUE AND SUITABILITY FOR PURCHASER'S PURPOSES.

EXCEPT AS TO MATTERS SPECIFICALLY SET FORTH IN THIS AGREEMENT: (A) PURCHASER WILL ACQUIRE THE PROPERTY SOLELY ON THE BASIS OF ITS OWN PHYSICAL AND FINANCIAL EXAMINATIONS, REVIEWS AND INSPECTIONS AND THE TITLE INSURANCE PROTECTION AFFORDED BY THE OWNER'S POLICY, AND (B) WITHOUT LIMITING THE FOREGOING, PURCHASER WAIVES ANY RIGHT IT OTHERWISE MAY HAVE AT LAW OR IN EQUITY, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO SEEK DAMAGES FROM SELLER IN CONNECTION WITH THE ENVIRONMENTAL CONDITION OF THE PROPERTY, INCLUDING ANY RIGHT OF CONTRIBUTION UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT. THE PROVISIONS OF THIS SECTION 7.3 SHALL SURVIVE THE CLOSING.

       7.4    <u>Representations and Warranties of Purchaser</u>.  Purchaser represents and warrants to Seller that the following are true and correct as of the date hereof and shall be true and correct as of the Closing Date:

       (i)    The Purchaser is duly organized, validly existing and in good standing under the laws of the State of its formation.

       (ii)    The Purchaser has all necessary power and authority to enter into this Agreement and has taken all action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder, and no other proceedings on the part of the Purchaser are necessary to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Purchaser and is a valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms.

       (iii)    No consent, waiver, agreement, approval, permit or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of this Agreement or any agreement ancillary to this Agreement and the consummation of the transactions contemplated hereby or thereby.

       (iv)    On the Closing Date, the Purchaser will have cash on hand sufficient to deliver the Purchase Price to the Seller.

       (v)    Purchaser has delivered to Seller and The Bank of New York a true, complete and correct chart setting forth Purchaser's organizational structure and each of its direct or indirect constituent members, partners and/or shareholders.

       (vi)    Neither Seller, Steven Judelson, Peter Gaito, or any of their respective affiliates, have any, direct or indirect, legal or beneficial interest the Purchaser.

       (vii)    The representations and warranties of Purchaser shall survive the Closing.

7.5     Covenants of Purchaser.  Purchaser covenants that it will promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to testify before the Bankruptcy Court.

8.      Indemnification and Release.

8.1     Indemnification by Purchaser.  Purchaser shall hold harmless, indemnify and defend the Indemnified Parties from and against: (a) any and all third party claims for personal injury or property damage related to the Property or the ownership, operation or maintenance thereof and occurring on or after the Closing Date, (b) any and all loss, damage, expense or third party claims in any way arising from Purchaser's breach of this Agreement, and (c) all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Seller or The Bank of New York as a result of the foregoing.

8.2     RELEASE.     EFFECTIVE AS OF THE CLOSING, PURCHASER SHALL BE DEEMED TO HAVE RELEASED THE INDEMNIFIED PARTIES FROM ALL CLAIMS WHICH PURCHASER OR ANY AGENT, REPRESENTATIVE, AFFILIATE, EMPLOYEE, DIRECTOR, OFFICER, PARTNER, MEMBER, SERVANT, SHAREHOLDER OR OTHER PERSON OR ENTITY ACTING ON PURCHASER'S BEHALF OR OTHERWISE RELATED TO OR AFFILIATED WITH PURCHASER (EACH, A "PURCHASER RELATED PARTY") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO OR IN CONNECTION WITH THE PROPERTY INCLUDING THE DOCUMENTS AND INFORMATION REFERRED TO HEREIN, ANY CONSTRUCTION DEFECTS, ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF ALL OR ANY PORTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS, AND PURCHASER SHALL NOT LOOK TO ANY INDEMNIFIED PARTY IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF. THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION .

8.3     Survival.  The provisions of this Section 8 shall survive the Closing or earlier termination of this Agreement.

9.      Remedies For Default and Disposition of the Deposit.

9.1     SELLER DEFAULTS.  IF THE TRANSACTION HEREIN PROVIDED SHALL NOT BE CLOSED BY REASON OF SELLER'S DEFAULT UNDER THIS AGREEMENT, THEN PURCHASER SHALL HAVE, AS ITS EXCLUSIVE REMEDIES THE RIGHT TO EITHER (A) TERMINATE THIS AGREEMENT (IN WHICH EVENT THE DEPOSIT SHALL BE RETURNED TO PURCHASER, AND NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER EXCEPT WITH RESPECT TO THOSE PROVISIONS OF THIS AGREEMENT WHICH EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT), PURCHASER HEREBY

WAIVING ANY RIGHT OR CLAIM TO DAMAGES FOR SELLER'S BREACH, OR (B) SPECIFICALLY ENFORCE THIS AGREEMENT (BUT NO OTHER ACTION, FOR DAMAGES OR OTHERWISE, SHALL BE PERMITTED); AND PROVIDED FURTHER, THAT ANY ACTION BY PURCHASER FOR SPECIFIC PERFORMANCE MUST BE FILED, IF AT ALL, WITHIN THIRTY (30) DAYS OF SELLER'S DEFAULT, AND THE FAILURE TO FILE WITHIN SUCH PERIOD SHALL CONSTITUTE A WAIVER BY PURCHASER OF SUCH RIGHT AND REMEDY. IF PURCHASER SHALL NOT HAVE FILED AN ACTION FOR SPECIFIC PERFORMANCE WITHIN THE AFOREMENTIONED TIME PERIOD OR SO NOTIFIED SELLER OF ITS ELECTION TO TERMINATE THIS AGREEMENT, PURCHASER'S SOLE REMEDY SHALL BE TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH CLAUSE (A) ABOVE.

9.2     PURCHASER DEFAULTS. IF THE TRANSACTION HEREIN PROVIDED SHALL NOT BE CLOSED ON ACCOUNT OF PURCHASER'S DEFAULT, THEN THIS AGREEMENT SHALL TERMINATE AND SELLER'S SOLE AND EXCLUSIVE REMEDY UNDER THIS AGREEMENT, SHALL BE THE RETENTION OF THE DEPOSIT, SUBJECT TO THE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT; PROVIDED, HOWEVER, NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO LIMIT SELLER'S RIGHTS OR DAMAGES UNDER ANY INDEMNITIES GIVEN BY PURCHASER TO SELLER UNDER THIS AGREEMENT. IN CONNECTION WITH THE FOREGOING, THE PARTIES RECOGNIZE THAT SELLER WILL INCUR EXPENSE IN CONNECTION WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THAT THE PROPERTY WILL BE REMOVED FROM THE MARKET; FURTHER, THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN THE EXTENT OF DETRIMENT TO SELLER CAUSED BY THE BREACH BY PURCHASER UNDER THIS AGREEMENT AND THE FAILURE OF THE CONSUMMATION OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR THE AMOUNT OF COMPENSATION SELLER SHOULD RECEIVE AS A RESULT OF PURCHASER'S BREACH OR DEFAULT.

9.3     Disposition of Deposit.  In the event the transaction contemplated by this Agreement shall close, the Deposit shall be applied as a partial payment of the Purchase Price.

9.4     Survival.  The provisions of this Section 9 shall survive the Closing or earlier termination of this Agreement.

10.    Escrow Provisions.

10.1    Escrow.  Escrowee shall hold the Deposit in escrow and not in trust in a special interest bearing account. Interest earned on the Deposit shall be paid to the party entitled to the receipt of the Deposit. Escrowee shall pay the Deposit to Seller at the Closing or otherwise in accordance with this Agreement. If, prior to the Closing, either party makes a demand upon Escrowee for delivery of the Deposit, Escrowee shall give notice to the other party of such demand. If a notice of objection to the proposed payment is not received from the other party within three (3) Business Days after the giving of notice by Escrowee, Escrowee is hereby authorized to deliver the Deposit to the party who made the demand. If Escrowee receives a

notice of objection within said period, then Escrowee shall continue to hold the Deposit and thereafter pay it to the party entitled when Escrowee receives (a) a notice from the objecting party withdrawing the objection, or (b) a notice signed by both parties directing disposition of the Deposit, or (c) a judgment or order of a court of competent jurisdiction with respect to the disposition of the Deposit.

      10.2   <u>Terms</u>. The parties further agree that:

      (i)   Escrowee shall be protected in relying upon the accuracy, acting in reliance upon the contents, and assuming the genuineness of, any notice, demand, certificate, signature, instrument or other document which is given to Escrowee without verifying the truth or accuracy of any such notice, demand, certificate, signature, instrument or other document;

      (ii)   Escrowee shall not be bound in any way by any other contract or understanding between the parties hereto, whether or not Escrowee has knowledge thereof or consents thereto unless such consent is given in writing;

      (iii)   Escrowee's sole duties and responsibilities shall be to hold and disburse the Deposit in accordance with this Agreement; provided, however, that Escrowee shall have no responsibility for the clearing or collection of the check representing the Deposit;

      (iv)   Escrowee shall not be liable for any action taken or omitted by Escrowee in good faith and believed by Escrowee to be authorized or within the rights or powers conferred upon it by this Agreement, except for damage caused by gross negligence of willful misconduct of Escrowee;

      (v)   Upon the disbursement of the Deposit in accordance with this Agreement, Escrowee shall be relieved and released from any liability under this Agreement;

      (vi)   Escrowee may resign at any time upon at least five (5) days prior written notice to the parties hereto. If, prior to the effective date of such resignation, the parties hereto shall all have approved, in writing, a successor escrow agent, then upon the resignation of Escrowee, Escrowee shall deliver the Deposit to such successor escrow agent. From and after such resignation and the delivery of the Deposit to such successor escrow agent, Escrowee shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement, all of which duties, responsibilities and obligations shall be performed by the appointed successor escrow agent. If for any reason the parties hereto shall not approve a successor escrow agent within such period, Escrowee may bring any appropriate action or proceeding for leave to deposit the Deposit with a court of competent jurisdiction, pending the approval of a successor escrow agent, and upon such deposit Escrowee shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement;

      (vii)   Seller and Purchaser hereby agree to, jointly and severally, indemnify, defend and hold harmless Escrowee from and against any liabilities, damages,

losses, costs or expenses incurred by, or claims or charges made against, Escrowee (including reasonable attorneys' fees and disbursements) by reason of Escrowee's acting or failing to act in connection with any of the matters contemplated by this Agreement or in carrying out the terms of this Agreement, except as a result of Escrowee's gross negligence or willful misconduct;

(viii)   In the event that a dispute shall arise in connection with this Agreement, or as to the rights of any of the parties in and to, or the disposition of, the Deposit, Escrowee shall have the right to (w) hold and retain all or any part of the Deposit until such dispute is settled or finally determined by litigation, arbitration or otherwise, or (x) deposit the Deposit in the Bankruptcy Court, following which Escrowee shall thereby and thereafter be relieved and released from any liability or obligation under this Agreement, or (y) institute an action in interpleader or other similar action permitted by stakeholders in the State of New York, or (z) interplead any of the parties in any action or proceeding which may be brought to determine the rights of the parties to all or any part of the Deposit;

(ix)   Escrowee shall not have any liability or obligation for loss of all or any portion of the Deposit by reason of the insolvency or failure of the institution of depository with whom the escrow account is maintained; and

(x)   The parties hereto represent that prior to the negotiation and execution of this Agreement they were advised that Escrowee was representing Seller as its attorney in connection with this Agreement and the transaction referred to herein and the parties hereto covenant that they shall not object, on the grounds of conflict of interest or otherwise, to Escrowee continuing to act as Seller's attorney in connection with this Agreement and the transaction contemplated herein, or to act as Seller's attorney in connection with any dispute in connection herewith or any other matter, as well as act as Escrowee hereunder.

(xi)   Notwithstanding anything to the contrary contained herein, the parties agree that the Bankruptcy Court shall have exclusive jurisdiction over any dispute regarding the rights of any of the parties in and to, or the disposition of, the Deposit.

10.3   Survival. The provisions of this Section 10 shall survive the Closing or a termination of this Agreement.

11.   Termination.

11.1   This Agreement may be terminated by mutual written consent of the Purchaser and the Seller at any time, in which case the Deposit shall be returned to the Purchaser so long as at the time of such termination Purchaser is not in default under this Agreement.

11.2   This Agreement shall terminate if the Sale Order is not entered by the date that is [_____] days from the date hereof.

12.   Miscellaneous.

12.1　Brokers.

12.1.1　Seller represents and warrants to Purchaser that no broker or finder has been engaged by Seller in connection with the sale contemplated under this Agreement other than Newmark & Company Real Estate, Inc. d/b/a Newmark Knight Frank ("Broker"). Seller has entered into a separate written agreement with Broker concerning the payment of a commission to Broker in connection with the sale contemplated hereby.

12.1.2　Purchaser represents and warrants to Seller and The Bank of New York that no broker or finder has been engaged by Purchaser in connection with the sale contemplated under this Agreement. In the event of a claim for broker's or finder's fee or commissions in connection with the sale contemplated by this Agreement (other than a claim made by Broker), then Purchaser shall indemnify, defend and hold harmless Seller and The Bank of New York from the same if it shall be based upon any statement or agreement alleged to have been made by Purchaser. The indemnification obligations under this Section 12.1.2 shall survive the Closing or a termination of this Agreement.

12.2　Limitation of Liability.

12.2.1　Notwithstanding anything to the contrary contained in this Agreement or any documents executed in connection herewith, subject to Section 12.2.2, if the Closing of the transaction contemplated hereunder shall have occurred, the aggregate liability of Seller arising pursuant to or in connection with the representations, warranties, indemnifications, covenants or other obligations (whether express or implied) of Seller under this Agreement (or any document or certificate executed or delivered in connection herewith) shall not exceed 1% of the Purchase Price.

12.2.2　No shareholder or agent of Seller, nor any Indemnified Party, shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or pursuant to the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and its successors and assigns and, without limitation, all other persons and entities, shall look solely to Seller's assets for the payment of any claim or for any performance, and Purchaser, on behalf of itself and its successors and assigns, hereby waives any and all such personal liability.

12.2.3　The provisions of this Section 12.2 shall survive the Closing or a termination of this Agreement.

12.3　Exhibits; Schedules; Entire Agreement; Modification.　All exhibits and schedules attached and referred to in this Agreement are hereby incorporated herein as if fully set forth in (and shall be deemed to be a part of) this Agreement. This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes any and all prior agreements between the parties hereto respecting such matters. This Agreement may not be modified or amended except by written agreement signed by both parties.

12.4　Business Days. Whenever any action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or

by a particular date) that ends (or occurs) on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day. As used herein, the term "Business Day" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in the State of New York are not required or authorized to be closed for business.

12.5 <u>Interpretation</u>. Section headings shall not be used in construing this Agreement. Each party acknowledges that such party and its counsel, after negotiation and consultation, have reviewed and revised this Agreement. As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to wit, that ambiguities in this Agreement should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto. Whenever the words "including," "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner. Except as otherwise indicated, all Exhibit, Schedules and Section references in this Agreement shall be deemed to refer to the Exhibits, Schedules and Sections in this Agreement.

12.6 <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law, and, where applicable, the U.S. Bankruptcy Code.

12.7 <u>Assignments; Successors and Assigns</u>. Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of the Seller, which consent may be given or withheld in the sole and absolute discretion of Seller. In the event of an assignment or transfer consented to by Seller, the transferee shall assume in writing all of the transferor's obligations hereunder (but Purchaser or any subsequent transferor shall not, in any event, be released from obligations hereunder). Notwithstanding and without limiting the foregoing, no consent given by Seller to any transfer or assignment of Purchaser's rights or obligations hereunder shall be deemed to constitute a consent to any other transfer or assignment of Purchaser's rights or obligations hereunder and no transfer or assignment in violation of the provisions hereof shall be valid or enforceable. Subject to the foregoing, this Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the parties.

12.8 <u>Notices</u>. All notices, requests or other communications which may be or are required to be given, served or sent by either party hereto to the other shall be deemed to have been properly given, if in writing and shall be deemed received (a) upon delivery, if delivered in person or by facsimile transmission, with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery), (b) one (1) Business Day after having been deposited for next day overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the United States Postal Office and sent by registered or certified mail, postage paid, return receipt requested, and in each case, addressed as follows:

To Seller:

Locust Street Developers

75 Alexander Avenue
Bronx, New York 10454
Attention: Steven Judelson

With a Copy To:


Weinberg, Gross & Pergament LLP
400 Garden City Plaza
Garden City, New York 11530
Attn: Marc A. Pergament, Esq.

The Bank of New York Mellon
One Wall Street, 16th Floor
New York, New York 10286
Attention: Peter Helt

and:

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
Attention: Karen Ostad, Esq.

To Purchaser:

[_____]
[_____]
[_____]

With a Copy To:

[_____]
[_____]
[_____]


12.9   <u>Third Parties</u>.  Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement upon any other person other than the parties hereto and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third parties any right of subrogation or action over or against any party to this Agreement. Except as set forth below, this Agreement is not intended to and does not create any third party beneficiary rights whatsoever. Notwithstanding the forgoing, The Bank of New York, as the existing mortgagee of the Property, shall be a third party beneficiary of the representations, warranties, covenants and indemnifications of Purchaser contained in this Agreement.

12.10  Legal Costs.  The parties hereto agree that they shall pay directly any and all legal costs which they have incurred on their own behalf in the preparation of this Agreement, all deeds and other agreements pertaining to this transaction, and that such legal costs shall not be part of the Closing costs.

12.11  Counterparts.  This Agreement may be executed in one or more counterparts, including counterparts transmitted by e-mail or facsimile, each of which shall be deemed an original. When counterparts, e-mail, or facsimile copies have been executed by all parties, they shall have the same effect as if the signatures to each counterpart or copy were upon the same documents, and e-mail and facsimile counterparts shall be deemed valid as originals.

12.12  Effectiveness.  In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each party hereto.

12.13  No Implied Waivers.  No failure or delay of either party in the exercise of any right or remedy given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified in this Agreement for exercise of such right or remedy has expired) shall constitute a waiver of any other or further right or remedy nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy. No waiver by either party of any breach hereunder or failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.

12.14  Discharge of Seller's Obligations.  Except as otherwise expressly provided in this Agreement, Purchaser's acceptance of the Deed shall be deemed a discharge of all of the obligations of Seller hereunder which are required to be performed at or prior to Closing and all of Seller's covenants and agreements (except express representations and warranties) in this Agreement shall merge in the documents and agreements executed at the Closing and shall not survive the Closing, except and to the extent that, pursuant to the express provisions of this Agreement, any of such covenants or agreements are to survive the Closing.

12.15  No Recordation.  Neither this Agreement nor any memorandum thereof shall be recorded and any attempted recordation hereof shall be void and shall constitute a default hereunder.

12.16  Unenforceability.  If all or any portion of any provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, then such invalidity, illegality or unenforceability shall not affect any other provision hereof, and such provision shall be limited and construed as if such invalid, illegal or unenforceable provision or portion thereof were not contained herein unless doing so would materially and adversely affect a party or the benefits that such party is entitled to receive under this Agreement.

12.17  **Waiver of Trial by Jury.** **SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED**

**WITH THIS AGREEMENT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.**

12.18   [Reserved].

12.19   Designation of Reporting Person. In order to assure compliance with the requirements of Section 6045 of the Code and any related reporting requirements of the Code, the parties hereto agree as follows:

(a)   The Seller and Purchaser agree to designate the Title Company (for purposes of this Section, the "Reporting Person") for the information reporting required under Section 6045(e) of the Code.

(b)   Seller and Purchaser each hereby agree:

(i)   to provide to the Reporting Person all information and certifications regarding such party as reasonably requested by the Reporting Person or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and

(ii)   to provide to the Reporting Person such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form the applicable current or future Code sections and regulations might require and/or any form requested by the Reporting Person), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to the Reporting Person is correct.

(c)   Except as may be otherwise affected by Seller's Bankruptcy Cases, each party hereto agrees to retain this Agreement for not less than four years from the end of the calendar year in which Closing occurred, and to produce it to the Internal Revenue Service upon a valid request therefore.

(d)   The addresses for Seller and Purchaser are as set forth in Section 12.8 herein, and the real estate subject to the transfer provided for in this Agreement is described in Exhibit A.

The provisions of this Section 12.19 shall survive the Closing.

12.20   Forum. Any dispute that arises under or relates to this Agreement (whether arising under contract, tort, at law or in equity) shall be resolved in the Bankruptcy Court.

12.21   Existing Mortgage. Purchaser expressly agrees and acknowledges that Purchaser's obligations hereunder are not in any way conditioned upon or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity investment, or otherwise) to consummate the transaction contemplated hereby. Notwithstanding the foregoing, Purchaser may seek and obtain, at its sole cost and expense, financing for the transaction contemplated by this Agreement. Seller agrees, upon

reasonable advance notice from Purchaser and at no additional cost or expense to Seller, to request that its lender cooperate with Purchaser and Purchaser's lender to effectuate an assignment to Purchaser's lender of the existing mortgage encumbering the Property (the "Existing Mortgage") and the debt it secures (and an endorsement of the related note to Purchaser's lender) and the Existing Mortgage shall then be a Permitted Exception with respect to the Property.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

**LOCUST STREET DEVELOPERS LLC**

By:_____
    Name:
    Title:

PURCHASER:

[_____]

By:_____
    Name:
    Title:

JOINDER AS TO SECTION 10
ONLY

MORRISON AND FOERSTER LLP

By: _____
Name:
Title:

A-1

## EXHIBIT A

ALL that certain plot, piece or parcel of land situate, lying and being in the City of Mount Vernon, County of Westchester, and State of New York, and shown and designated as Lots 204, 205, 206 and 207 on a certain map entitled, "Map of Northwest Mount Vernon, Situated in the Town of Eastchester, Westchester County, New York" made by August Kurth, Civil Engineer and Surveyor, dated September 20, 1854, and filed in the Office of the Clerk of the County of Westchester, Division of Land Records, on November 23, 1859 as Map No. 95 being more particularly described as follows:

BEGINNING at a point on the northerly side of Locust Street where the same is intersected by the dividing line between Lots Nos. 207 and 209 as shown on the said map;

THENCE along the last mentioned division line in a northerly direction parallel with William Street 200.00 feet to the southerly side of MacQuesten Parkway North;

THENCE along the southerly side of MacQuesten Parkway North in an easterly direction 100.00 feet to the westerly side of William Street;

THENCE along the westerly side of William Street in a southerly direction 200.00 feet to the northerly side of Locust Street;

THENCE along the northerly side of Locust Street in a westerly direction 100.00 feet to the point or place of BEGINNING.

A-2

## **EXHIBIT B**

(Additional Exceptions to Title)

# EXHIBIT C

## DEED

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT – THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

---

**THIS INDENTURE,** made the                              day of
and

**BETWEEN**


party of the first part, and


party of the second part,

**WITNESSETH,** that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the seconds part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the

**TOGETHER** with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above described

premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first

part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of

1

the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

_____     _____

_____     _____

**Acknowledgement taken in New York State**

State of New York, County of                    ss:

On the        day of        , in the year        , before
me, the undersigned, personally appeared

personally known to me or proved to me on the
basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed
to the within instrument and acknowledged to
me that he/she/they executed the same in
his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the
individual(s) or the person upon behalf of
which the individual(s) acted, executed the
instrument.

**Acknowledgement by Subscribing Witness
taken in New York State**

State of New York, County of                    ss:

On the        day of        , in the year        , before
me, the undersigned, personally appeared

the subscribing witness to the foregoing
instrument, with whom I am personally
acquainted, who being by me duly sworn, did
depose and say, that he/she/they reside(s) in

that he/she/they know(s)
to be the individual described in and who
executed the foregoing instrument; that said
subscribing witness was present and saw said
execute the same; and that said witness at the
same time subscribed his/her/their name(s) as a
witness thereto.

Title No. _____

**Acknowledgement taken in New York State**

State of New York, County of                    ss:

On the        day of        , in the year        , before
me, the undersigned, personally appeared

personally known to me or proved to me on the
basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed
to the within instrument and acknowledged to
me that he/she/they executed the same in
his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the
individual(s) or the person upon behalf of
which the individual(s) acted, executed the
instrument.

**Acknowledgement taken outside New York
State**

*State of New York, County of                    ss:
*(or insert District of Columbia, Territory,
Possession or Foreign Country)

On the        day of        , in the year        , before
me, the undersigned, personally appeared

personally known to me or proved to me on the
basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed
to the within instrument and acknowledged to
me that he/she/they executed the same in
his/her/their capacity(ies), and that by
his/her/their signature(s) on the instrument, the
individual(s) or the person upon behalf of
which the individual(s) acted, executed the
instrument, and that such individual made such
appearance before the undersigned in the

(add the city or political subdivision and the
sate or country or other place the
acknowledgement was taken).

3

## SCHEDULE A TO DEED

(PROPERTY DESCRIPTION)

## CERTIFICATION OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by [_____], a [_____] (the "Company"), the undersigned hereby certifies the following on behalf of the Company that:

1. The Company is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. The U.S. Federal Identification Number of the Company is [_____]; and

3. The Company is not a disregarded entity as defined in Internal Revenue Regulations §1.1445.2(b)(2)(iii); and

The address of the Company is:

c/o_____
_____
_____

The Company understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that the undersigned has examined this certification and to the best of his knowledge and belief it is true, correct and complete, and the undersigned further declares that he has authority to sign this document on behalf of the Company.

Dated: [_____], 20__

[_____]

By:_____
    Name:
    Title:

1

BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Assignment") is executed as of the _____ day of _____, 20___ by _____, a _____, having an address _____ _____ ("Assignor") in favor of _____, a _____, having an address c/o _____ ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of _____ between Assignor and Assignee).

WHEREAS, Assignor desires to assign, transfer, set over and deliver to Assignee all of Assignor's rights, if any, in and for all furnishings, fixtures, fittings, appliances, apparatus, equipment, machinery and other items of personal property, if any, affixed or attached to, or placed or situated upon, the Property, and the following incidental rights and appurtenances relating thereto (collectively, the "Assigned Properties"):

A.	To the extent assignable without third party consents or any cost or expense to Assignor, all of Assignor's right, title and interest in and to all use, occupancy, building and operating permits, licenses, approvals, documents, instruments, if any, issued from time to time with respect to the Property or the Assigned Properties; provided, however, if any such assignment may be made at an additional cost or expense, Assignor shall assign all of Assignor's right, title and interest therein if and to the extent Assignee shall pay such additional cost or expense; and

B.	All of Assignor's right, title and interest in and to all existing and assignable guaranties and warranties (express or implied), if any, issued in connection with the construction, alteration and repair of the Property and/or the purchase, installation and the repair of the Assigned Properties.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.	Assignor hereby assigns, transfers, sets over and delivers to Assignee, its successors and assigns, all of Assignor's right, title and interest, if any, in and to the Assigned Properties.

2.	This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

3.	This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall

constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

4. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

[_____]


By:_____
    Name:
    Title:

ny-896749